[Cite as *Thomas v. Delgado*, 2022-Ohio-4235.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**PUTNAM COUNTY**

BELINDA THOMAS,

    PLAINTIFF-APPELLANT,           CASE NO.  12-22-06

    v.

CARLOS S. DELGADO, ET AL.,           O P I N I O N

    DEFENDANTS-APPELLEE.

Appeal from Putnam County Common Pleas Court
Trial Court No.  2020 CV 0164

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   November 28, 2022

APPEARANCES:

    *Drew A. Hanna* for Appellant

    *Barry E. Schroder* for Appellee

**ZIMMERMAN, P.J.**

{¶1} Although originally placed on our accelerated calendar, we have elected pursuant to Loc.R. 12(5) to issue a full opinion in lieu of a summary journal entry. Plaintiff-appellant, Belinda Thomas ("Thomas"), appeals the April 12, 2022 judgment of the Putnam County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Carlos S. Delgado ("Carlos"), Betty Luna ("Luna"), and Paul Delgado ("Paul") (collectively, "defendants"), and dismissing her complaint. For the reasons that follow, we affirm in part and reverse in part.

{¶2} This case stems from a dispute over the estate of Adelina Delgado ("Adelina"). Thomas and the defendants are all adult children and heirs of Adelina. Adelina was preceded in death by her husband (and the children's father), Marcos Delgado ("Marcos"), on January 4, 2004.[1] Because Marcos's death resulted from asbestos poisoning, Adelina received a large settlement soon after his death.

{¶3} Prior to his death, Marcos managed the family's financial dealings. However, following his death, Carlos assumed responsibility for Adelina's financial matters. *Compare Ross v. Barker*, 101 Ohio App.3d 611, 618-119 (2d Dist.1995) (listing that the decedent was elderly and in poor health when he moved into [the defendant's] home. He was dependent on her for all his needs. He was also largely

---

[1] In his affidavit in support of his motion for summary judgment, Carlos avers that Marcos died on January 31, 2004.

isolated from the other members of his family. [He] was illiterate. He had never handled his own financial affairs"). Adelina was in her mid-seventies at that time.

{¶4} Further, Carlos (and his family) as well as Luna (and her family) relocated to Adelina's residence, resulting in 13 people residing in the residence. *See Fox v. Stockmaster*, 3d Dist. Seneca No. 13-01-34, 2002-Ohio-2824, ¶ 3 ("While caring for her father, [the defendant] and her husband lived on the family farm without paying any rent. [The defendant] did not hire any professionals to help take care of her father or to clean the home."). Similarly, Thomas alleges that the defendants isolated Adelina from "outsiders" and that Adelina "suffered considerable loss of weight and frequent falls" because the defendants "failed to provide healthy living quarters for her, and to provide for her reasonable care." (Doc. No. 1).

{¶5} Adelina executed a durable power of attorney on January 23, 2004, appointing Marcos as her attorney in fact and Carlos as her alternate attorney in fact. The durable power of attorney authorized Adelina's alternate agent to act with "an affidavit or certificate of such Alternate Agent that those persons named as prior Agents are no longer serving." (Doc. No. 23, Ex. 1). As relevant here, the durable power of attorney authorized as follows:

> (7) **Power with Respect to Bank Accounts**. My Agent is authorized to * * * write checks on or make withdrawals from * * * all accounts in my name or with respect to which I am an authorized signatory, to negotiate, endorse or transfer any checks or other instruments with

respect to any such accounts; to contract for any services rendered by any bank or financial institution.

\* \* \*

(11) **Power to Make Gifts**. My Agent is authorized to make gifts of tangible or intangible personal property to any person, persons, \* \* \*, or other entities (including specifically and unequivocally my attorney-in-fact named herein).

(Emphasis sic.) (*Id.*).

{**¶6**} In her complaint, Thomas alleges that Carlos improperly executed the following money transfers under the authority of the durable power of attorney. Between January 25, 2008 and July 26, 2010, Thomas alleges that Carlos effected a series of cash withdrawals (which Thomas specified as 24 transactions) from Adelina's Fort Jennings State Bank account totaling $135,000.00. The record reflects that Carlos signed the majority of the withdrawal slips in his individual capacity. However, there are a fraction of withdrawal slips on which Carlos wrote Adelina's name (yet signed in his individual capacity); one bearing his name on which he signed "Carlos S. Delgado P.O.A."; and one bearing his individual signature but with the designation "Carlos Delgado for Adelina Delgado." (Doc. No. 1, Ex. 2).

{**¶7**} Between March 25, 2008 and June 18, 2010, Thomas alleges that Carlos completed a series of cashier's check withdrawals (which Thomas specified as 15 transactions) made out to various companies and persons from Adelina's Fort

Jennings State Bank account totaling $20,455.05. The withdrawal slips reflect the same issues that the cash-withdrawal slips reveal—that is, some of the withdrawal slips reflect only Carlos's name and individual signature, while some reflect that Carlos marked Adelina's name (yet signed in his individual capacity). As to the cashier's checks, Carlos signed all of the cashier's checks in his individual capacity except for two, which are signed "Adelina Delgado"; however, a simple comparison of the signatures suggests that Carlos forged Adelina's signature. (Doc. No. 1, Ex. 3).

{¶8} Between February 7, 2011 and October 19, 2011, Thomas alleges that Carlos completed a series of eight withdrawals from Adelina's Fort Jennings State Bank account totaling $1,707.32, which resulted in the closure of the account. Similarly, between December 2, 2015 and November 28, 2017, Thomas alleges that Carlos completed a series of check and debit withdrawals (which Thomas specifies as 18 transactions) totaling $16,371.00 from Adelina's Union Bank account (1796). And, between April 29, 2013 and November 21, 2017, Thomas alleges that Carlos completed a series of seven withdrawals totaling $6,300.00 from Adelina's Union Bank account (8011).

{¶9} Furthermore, Thomas alleges that Carlos effected a series of wire transfers and cashier's check withdrawals (which Thomas specifies as 16 transactions) from Adelina's Fort Jennings State Bank account between January 25,

2008 and December 23, 2010 totaling $138,500.00 to Luna. Importantly, Carlos indicated Adelina as the sender on the wire transfers but signed all transactions (except for two) in his individual capacity. On the cashier's checks, Carlos signed in his individual capacity, but marked Adelina's name on some of the withdrawal slips. Likewise, Thomas alleges that Carlos effected a series of 13 wire transfers from Adelina's Fort Jennings State Bank account between January 25, 2008 and December 7, 2010 totaling $132,000.00 to Paul. Again, Carlos indicated Adelina as the sender but signed all (except for two) in his individual capacity.

{¶10} In sum, Thomas alleges in her complaint that Carlos improperly transferred $450,333.37 from Adelina's bank accounts in his capacity as attorney in fact for Adelina.[2] Likewise, Thomas alleges that Carlos unduly influenced Adelina to transfer her real property to him on June 8, 2010.

{¶11} On January 16, 2018, the Putnam County Probate Court ("probate court") appointed Carlos as Adelina's guardian.[3] A "first and final account" of

---

[2] On November 29, 2021, Thomas filed an amended exhibit list alleging that Carlos improperly withdrew (in his capacity as attorney in fact for Adelina) $500,442.37 from Adelina's Fort Jennings State Bank account and that he transferred $464,022.37 of those funds to himself and the other defendants. Specifically, Thomas alleges that Carlos improperly transferred (1) $158,487.37 from Adelina's Fort Jennings State Bank account between January 25, 2008 and October 19, 2011 in a series of 47 transactions; (2) $138,500.00 from Adelina's Fort Jennings State Bank account (which Thomas specifies as 16 transactions) between January 25, 2008 and December 23, 2010 to Luna; and (3) $132,000.00 from Adelina's Fort Jennings State Bank account (which Thomas specifies as 13 transactions) between January 25, 2008 and December 7, 2010 to Paul. Thomas further alleges that Carlos improperly transferred (in his capacity as attorney in fact for Adelina) $16,871.00 from Adelina's Union Bank account (1796) (in a series of 18 transactions) between December 3, 2015 and December 19, 2017 and $6,300.00 (from account 8011) (in a series of 7 transactions) between April 29, 2013 and November 21, 2017 (account 8011). On December 10, 2021, Thomas amended her exhibits to allege that Carlos improperly transferred (in his capacity as attorney in fact for Adelina) $36,057.50 (in a series of 14 transactions) from Adelina's Union Bank account (1796) between December 2015 and January 2018.
[3] Thomas requested that the probate court appoint her as Adelina's guardian.

Adelina's guardianship was provided to the probate court indicating a balance of $198,771.38 following $223,692.25 in disbursements.[4]  (Doc. No. 1, Ex. 10).[5]

**{¶12}** Adelina died on June 10, 2019.  Adelina's will, which was executed on August 22, 1984, was admitted to the probate court on October 3, 2019.  As relevant to this case, the will devises equal shares of Adelina's estate to each of her children.  An "inventory and appraisal" of Adelina's probate estate was provided to the probate court reflecting a balance of $10,293.00.[6]

**{¶13}** Consequently, Thomas alleges that the defendants misappropriated $862,503.00 from Adelina, depriving Thomas of $215,626.00 (a 1/4 share of that

---

[4] Only page 11 of 11 of the final account of Adelina's guardianship was filed in this case.

[5] In its entry granting summary judgment in favor of the defendants, the trial court notes that the final account of Adelina's guardianship was filed with the probate court on December 1, 2019; however, the record reflects that it was file stamped March 30, 2020. (*See* Doc. No. 1, Ex. 10).  Under Evid.R. 201, judicial notice permits a court to accept a well-known and indisputable fact without requiring a party's proof for the purpose of convenience. *NorthPoint Properties, Inc. v. Petticord*, 179 Ohio App.3d 342, 2008-Ohio-5996, ¶ 16 (8th Dist.).  "However, a trial court cannot take judicial notice of court proceedings in another case." *Id.*, citing *Campbell v. Ohio Adult Parole Auth.*, 10th Dist. Franklin No. 97APE05-616, 1997 WL 678199, *2 (Oct. 28, 1997).  "Similarly, 'a trial court may not take judicial notice of prior proceedings in the court even if the same parties and subject matter are involved.'" *Id.*, quoting *First Michigan Bank & Tr. Co. v. P. & S. Bldg.*, 4th Dist. Meigs No. 413, 1989 WL 11915, *4 (Feb. 16, 1989).  *See also In re Change of Name K.S.G. to K.S.G-B.*, 3d Dist. Hancock No. 5-20-03, 2020-Ohio-4515, ¶ 9.  That is, "[a] trial court 'may only take judicial notice of prior proceedings in the immediate case.'" *NorthPoint Properties* at ¶ 16, quoting *In re Lodico*, 5th Dist. Stark No. 2003-CA-00446, 2005-Ohio-172, ¶ 94. Importantly, "'[t]he rationale for the rule that a trial court cannot take judicial notice of proceedings in a separate action is that the appellate court cannot review the propriety of the trial court's reliance on such prior proceedings because that record is not before the appellate court.'" *Id.*, quoting *Campbell* at *2.

[6] In its entry granting summary judgment in favor of the defendants, the trial court notes that the final account of Adelina's probate estate was filed with the probate court on December 29, 2020; however, the record reflects that it was file stamped on May 8, 2020. (*See* Doc. No. 1, Ex. 11).  Importantly, the Supreme Court of Ohio has authorized trial courts to take judicial notice of its own docket, including the docket in a separate case.  *In re Change of Name K.S.G. to K.S.G-B.* at ¶ 10.  However, "[t]he trial court cannot take judicial notice of a docket ""for the truth of the matters asserted the other litigation,"'" however, but only ""to establish the fact of such litigation."""  *Pollard v. Elber*, 6th Dist. Erie No. E-17-050, 2018-Ohio-4538, ¶ 15, quoting *State ex rel. Coles v. Granville*, 116 Ohio St.3d 231, 2007-Ohio-6057, ¶ 20, quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992), quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

amount) of her inheritance of Adelina's estate. As a result, on December 29, 2020, Thomas filed a complaint in the trial court asserting eight claims against the defendants: (1) tortious deprivation of plaintiff's right to inherit; (2) fraud; (3) conversion; (4) an accounting; (5) unjust enrichment; (6) a constructive trust; (7) a lis pendens; and (8) intentional infliction of emotional distress. Importantly, Thomas sought compensatory and punitive damages as well as the return of Adelina's residence to the estate. The defendants filed an answer on February 2, 2021 along with an amended answer on November 8, 2021.

{¶14} On January 28, 2022, the defendants filed a motion for summary judgment, arguing (in relevant part) that they are entitled to judgment as a matter of law because the durable power of attorney unequivocally authorized Carlos to execute the money transfers. The only evidence submitted in support of the defendants' motion for summary judgment is an affidavit from Carlos. That same day, the defendants filed a motion for attorney fees.

{¶15} On February 24, 2022, Thomas filed a memorandum in opposition to the defendants' motion for summary judgment, arguing that genuine issues of material fact remain regarding as to whether Carlos acted within his fiduciary duty under the durable power of attorney.

{¶16} On April 12, 2022, the trial court granted summary judgment in favor of the defendants and dismissed the complaint. The trial court concluded that the

defendants are entitled to judgment as a matter of law since "[a] valid [power of attorney], a valid transfer of real estate and a valid guardianship plainly indicates that transfers were conducted legally even though maybe not equally." (Doc. No. 63). Further, the trial court denied the defendants' motion for attorney fees.

{¶17} On May 4, 2022, Thomas filed a notice of appeal. She raises three assignments of error for our review, which we will discuss together.

### Assignment of Error No. I

**The Trial Court Erred in Granting Summary Judgment As The Procurement of The Power of Attorney By Defendant-Appellee Carlos Delgado Was the Result of Undue Influence.**

### Assignment of Error No. II

**The Trial Court Erred in Granting Summary Judgment in Favor of Defendant-Appellees Because Genuine Issues of Material Fact Remained By Which a Reasonable Mind Could Have Found in Favor of Plaintiff-Appellant on the Issues of:**

> **(1) Tortious Deprivation of Right to Inherit**
> **(2) Fraud.**

### Assignment of Error No. III

**The Trial Court Erred in Granting Summary Judgment As to the $188,478 Unaccounted For Between the Termination of the Guardianship and the Opening of the Estate.**

{¶18} In her assignments of error, Thomas argues that the trial court erred by granting summary judgment in favor of the defendants after concluding that there is no genuine issue of material fact that the transfers were lawfully effected. In

particular, under her first assignment of error, Thomas argues that there is a genuine issue of material fact whether the transfers were lawfully effected because "the procurement of the Power of Attorney by [Carlos] was the result of Undue Influence." (Appellant's Brief at 11). Under her second assignment of error, Thomas specifically argues that there are genuine issues of material fact as to whether the defendants intentionally interfered with her expectancy of an inheritance under Adelina's will and whether the defendants fraudulently transferred $862,503.00 from Adelina's estate. Finally, Thomas contends under her third assignment of error that judgment in favor of the defendants is improper based on the $188,478.38 discrepancy between the final account of Adelina's guardianship and the final account of Adelina's probate estate provided to the probate court.

*Standard of Review*

{¶19} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

*Analysis*

**{¶20}** We will begin by discussing Thomas's argument that the trial court erred by granting summary judgment in favor of the defendants as to her intentional-interference-with-the-expectancy-of-an-inheritance claim, followed by Thomas's argument that the trial court erred by granting summary judgment in favor of the defendants as to her undue-influence claim. Finally, we will address whether the trial court erred by granting summary judgment in favor of the defendants as to Thomas's fraud claim.

*Intentional Interference With The Expectancy Of An Inheritance*

**{¶21}** Resolving that Thomas's complaint is properly before the general division of the court of common pleas, we conclude that genuine issues of material fact as to Thomas's intentional-interference-with-expectancy-of-an-inheritance claim remain.[7] *Compare Love v. Love*, 4th Dist. Jackson No. 20CA4, 2021-Ohio-558, ¶ 33 *with Roll v. Edwards*, 156 Ohio App.3d 227, 2004-Ohio-767, ¶ 28 (4th Dist.). *See also Firestone v. Galbreath*, 895 F.Supp. 917, 927 (S.D.Ohio 1995); *Widdig v. Watkins*, 4th Dist. Scioto No. 13-CA-3531, 2013-Ohio-3858, ¶ 36.

**{¶22}** To prove a claim of intentional interference with the expectancy of an inheritance, a plaintiff must demonstrate (1) an existence of an expectancy of

---

[7] Because neither the defendants (in their motion for summary judgment or appellee's brief) nor the trial court addressed the application of the statute of limitations to Thomas's intentional-interference-with-expectancy-of-inheritance claim, we will not address it for the first time here.

-11-

inheritance; (2) an intentional interference by the defendant with that expectancy of inheritance; (3) conduct by the defendant involving the interference which is tortious in nature, such as fraud, duress, or undue influence; (4) a reasonable certainty that the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damages resulting from the interference. *Firestone v. Galbreath*, 67 Ohio St.3d 87, 88 (1993).

{¶23} Here, there is no dispute that Thomas had an expectancy of inheritance under Adelina's will. *Accord McWreath v. Cortland Bank*, 11th Dist. Trumbull No. 2010-T-0023, 2012-Ohio-3013, ¶ 51 (establishing that "the terms of a will or a trust can suffice, in and of themselves, to establish the existence of a proper expectancy of an inheritance"), citing *Sull v. Kaim*, 172 Ohio App.3d 297, 2007-Ohio-3269, ¶ 14 (8th Dist.); *Beadle v. O'Konski-Lewis*, 6th Dist. Lucas No. L-15-1216, 2016-Ohio-4749, ¶ 18 (establishing that "appellant has an expectancy of inheritance by virtue of the March 23, 2000 will"). *See also Brown v. Ralston*, 7th Dist. Belmont No. 14 BE 0051, 2016-Ohio-4916, ¶ 56; R.C. 2107.04. Nor is there a dispute as to whether the defendants were aware of the provisions of Adelina's will. *See Firestone*, 895 F.Supp. at 930. *See also Brown* at ¶ 59.

{¶24} Nonetheless, the parties dispute whether the defendants intentionally interfered with Thomas's expectancy of that inheritance through fraud or undue influence and that, but for the defendants' conduct, Thomas would have received

"one fourth of [Adelina's] Estate, or the sum of $163,125.09." (Appellant's Brief at 13). (*See also* Appellee's Brief at 6). Specifically, Thomas contends that there was "a coordinated effort among [the defendants] to control Adelina so to benefit from her wealth at her expense and at the expense of [Thomas]" through the power of attorney to transfer "a total of $862,503.00 of Adelina's wealth to and among [Carlos] and the other [defendants]" without disclosing "these transfers to Adelina." (Appellant's Brief at 14-16). The defendants dispute Thomas's argument and contend that "gifting, including self-gifting, was permitted under this power of attorney" and that Adelina "had at least two opportunities (the creation of the power of attorney and her transfer of her home) to consult with counsel."[8] (Appellee's Brief at 5, 7).

> **{¶25}** Generally,
>
> "[f]raud has various elements: (1) a representation (or concealment of a fact when there is a duty to disclose) (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable reliance, and (6) resulting injury proximately caused by the reliance."

---

[8] The defendants allege that Thomas's "factual allegations should not be considered under review, as they are not timely." (Appellee's Brief at 5). However, "whether to consider an untimely filed affidavit is within the trial court's discretion" even though "Civ.R. 56(C) is clear that affidavits must be timely filed." *Brown v. Ralston*, 7th Dist. Belmont No. 14 BE 0051, 2016-Ohio-4916, ¶ 32, citing *Bush v. Dictaphone Corp.*, 10th Dist. Franklin No. 00AP-1117, 2003-Ohio-883, ¶ 76 and *Widlar v. Young*, 6th Dist. No. L-05-1184, 2006-Ohio-868, ¶ 37. Since the trial court considered Thomas's factual allegations provided in her memorandum in opposition to the defendants' motion for summary judgment, this court will also review those factual allegations in our review of whether summary judgment in favor of the defendants is proper.

*McWreath,* 2012-Ohio-3013, at ¶ 61, quoting *Volbers-Klarich v. Middletown Mgt.*, 125 Ohio St.3d 494, 2010-Ohio-2057, ¶ 27. *See also Firestone*, 895 F.Supp. at 931 (listing the elements of fraud in connection with an intentional-interference-with-the-expectancy-of-an-inheritance claim). "'[O]ne who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them."'" *Universal Real Estate Sols., Inc. v. Snowden*, 9th Dist. Summit No. 27171, 2014-Ohio-5813, ¶ 12, quoting *State v. Warner*, 55 Ohio St.3d 31, 54 (1990), quoting *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108 (1980).

**{¶26}** Alternatively, the elements of undue influence require proof that "(1) the testator was susceptible to undue influence, (2) another person had an opportunity to exert influence over the susceptible testator, (3) improper influence was exerted or attempted and (4) a result showing the effect of such influence." *Young v. Kaufman*, 8th Dist. No. 104990, 2017-Ohio-9015, ¶ 52. *See also Firestone* at 931 (listing the elements of undue influence in connection with an intentional-interference-with-the-expectancy-of-an-inheritance claim). "'Undue influence occurs when the wishes and judgment of the transferor are substituted by the wishes and judgment of another.'" *Simon v. Aulino*, 4th Dist. Adams No. 18CA1076, 2020-

Ohio-6962, ¶ 22, quoting *Grimes v. Grimes*, 4th Dist. Washington No. 08CA35, 2009-Ohio-3126, ¶ 36. "Exercise of undue influence 'need not be shown by direct proof, but maybe inferred from the circumstances.'" *Id.* at ¶ 41, quoting *Calloway v. Roy*, 10th Dist. Franklin No. 77AP-301, 1977 WL 200400, *3 (Sept. 8, 1977).

**{¶27}** "However, undue influence is *presumed* if the challenging party establishes a fiduciary or confidential relationship existed between the decedent and a beneficiary." (Emphasis added.) *Foelsch v. Farson*, 5th Dist. Knox No. 19CA000036, 2020-Ohio-1259, ¶ 17. *See also Young* at ¶ 55; *Ciszewski v. Kolaczewski*, 9th Dist. Summit No. 26508, 2013-Ohio-1765, ¶ 11 ("Where a confidential relationship exists between the donor and the donee, a presumption of undue influence arises."). "A fiduciary relationship is 'a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."'" *Ciszewski* at ¶ 10, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 442 (1996), quoting *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 115 (1974). "A fiduciary's role may be assumed by formal appointment or may arise from a more informal confidential relationship, wherein 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social,

domestic, or merely personal.'" *Foelsch* at ¶ 20, quoting *Craggett v. Adell Ins. Agency*, 92 Ohio App.3d 443, 451 (8th Dist.1993).

**{¶28}** In this case, Thomas alleges that genuine issues of material fact remain as to whether Carlos violated his fiduciary duty to Adelina by making gifts to himself as well as to Luna and Paul under the durable power of attorney. "A power of attorney is a written instrument that authorizes an agent to perform specific acts on behalf of his principal." *Bacon v. Donnet*, 9th Dist. Summit No. 21201, 2003-Ohio-1301, ¶ 28. "The holder of a power of attorney has a fiduciary relationship with his or her principal and is not required to have used the power of attorney for a confidential or fiduciary relationship to arise." *Young* at ¶ 57, citing *In re Estate of Kiefer*, 2d Dist. Miami No. 2016-CA-12, 2017-Ohio-6997, ¶ 12 and *Bayes v. Dornon*, 2d Dist. Clark No. 2014-CA-129, 2015-Ohio-3053, ¶ 48, 50. Because "[t]he holder of a power of attorney has a fiduciary relationship with the principal," the "fiduciary relationship imposes a duty of loyalty to the principal." *Temple v. Temple*, 3d Dist. Marion No. 9-14-26, 2015-Ohio-2311, ¶ 29, citing *In re Scott*, 111 Ohio App.3d 273, 276 (6th Dist.1996).

**{¶29}** "The law is zealous in guarding against abuse of such a relationship." *Bacon* at ¶ 30, citing *In re Termination of Employment of Pratt* at 115. "Any transfer of property from a principal to his attorney-in-fact is viewed with some suspicion." *Id.*, citing *Studniewski v. Krzyzanowski*, 65 Ohio App.3d 628, 632 (6th Dist.1989).

Indeed, "attorneys-in-fact act outside the scope of their authority when they use a general, durable power of attorney to make gifts to themselves." *MacEwen v. Jordan*, 1st Dist. Hamilton No. C-020431, 2003-Ohio-1547, ¶ 11.

**{¶30}** Importantly, "a general, durable power of attorney does not authorize attorneys-in-fact to transfer the principal's property to themselves or to others, unless the power of attorney explicitly confers this power." *Id.* at ¶ 12. *See also Hutchings v. Hutchings*, 6th Dist. Sandusky No. S-19-008, 2019-Ohio-5362, ¶ 28 (observing that "without the express authority to self-deal, any transfer of assets using a power of attorney [is] presumptively invalid"); *Temple* at ¶ 29. *See also* R.C. 2109.44. "This rule applies to both transfers made to the attorney-in-fact and gifts to third parties." *Lance v. Boldman*, 9th Dist. Wayne No. 16AP0032, 2018-Ohio-44, ¶ 38. "In such a case, the attorney-in-fact is obligated to demonstrate the fairness of his conduct." *Bacon* at ¶ 30, citing *In re Scott* at 276, *In re Estate of Case*, 2d Dist. Montgomery No. 16747, 1998 WL 151141, *3 (Apr. 3, 1998), and *In re Estate of Harmon*, 9th Dist. Wayne No. 95CA0066, 1996 WL 304281, *1 (June 5, 1996) ("It is a most egregious violation of a fiduciary's duty to abuse the relationship through acts of self-dealing."). In other words, "where * * * the principal has made an express grant of authority to an attorney-in-fact to make gifts to third persons, including the attorney-in-fact, the attorney-in-fact may, in the

absence of evidence of undue influence upon the principal, make such gifts." *MacEwen* at ¶ 12.

**{¶31}** "Notwithstanding any express authority included in a power of attorney to make gifts to oneself and to create trusts, a fiduciary remains subject to a standard of care." *Bacon* at ¶ 44. *See also MacEwen* at ¶ 13 ("While this grant of authority effectively extinguishes any duty the attorney-in-fact has to avoid self-dealing, it does not remove all obligations owed to the principal."). "The fiduciary, therefore, continues to be bound by the overriding duty of loyalty to act for the benefit of the principal and *not* for the benefit of himself." (Emphasis added.) *Bacon* at ¶ 44. "Any gifts must be made in the best interests of the principal and solely to further the interests of the principal, even at the expense of the agent's interests." *Id.* That is, "[a] fiduciary may not use the special confidence and trust which a fiduciary duty imposes to acquire or retain property for himself." *Id.* at ¶ 45, citing *Connelly v. Balkwill*, 160 Ohio St. 430, 440-441 (1954), *Gotthardt v. Candle*, 131 Ohio App.3d 831, 835 (7th Dist.1999), and *In re Scott* at 276. "Thus, attorneys-in-fact bear the initial burden of proving the validity of a transfer to themselves [or a third party] under the power of attorney, while the party attacking the transfer retains the ultimate burden of proving undue influence by clear and convincing evidence." *MacEwen* at ¶ 13. *See also Lance* at ¶ 39. "'The donee may rebut the presumption of undue influence by a preponderance of the evidence.'"

*Fox*, 2002-Ohio-2824, at ¶ 51, quoting *In re Guardianship of Blumetti*, 11th Dist. Trumbull No. 92-T-4752, 1994 WL 45250, *3 (Jan. 14, 1994).

**{¶32}** "'Clear and convincing evidence' is more than a preponderance of the evidence, but does not rise to the level of certainty required by the beyond a reasonable doubt standard in criminal cases." *Young*, 2017-Ohio-9015, at ¶ 52. "It is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.* However, "[b]ecause 'the person who can give the best evidence is dead,' most evidence of undue influence 'will be circumstantial, leaving the factfinder to draw permissible inferences.'" *Young* at ¶ 52, quoting *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 102 (1994).

**{¶33}** When "determining the validity of such a transfer, a court must first look to the express grant of authority in the text of the power of attorney. Absent that grant, the transfer is presumptively invalid." *MacEwen* at ¶ 14.

> A court must next look to other considerations, based upon the unique facts of the case, which may include whether a transfer depleted assets necessary to maintain the principal's lifestyle; whether the principal knew of the gift and authorized it in some manner; whether the recipient of the transfer was the natural object of the principal's bounty and affection; whether the transfer was consistent with the principal's estate plan; whether the gift was a continuation of the principal's pattern of making gifts; and whether the transfer was made for another legitimate goal, such as the reduction of estate taxes.

*Id.*

**{¶34}** In this case, there is no dispute that Carlos was Adelina's attorney-in-fact and that the power of attorney expressly authorized Carlos to make gifts to third parties (including himself). Indeed, the trial court granted summary judgment in favor of the defendants after concluding that the power of attorney authorized Carlos "to make gifts to himself or to others as he saw appropriate." (Doc. No. 63). However, the trial court did not analyze whether Carlos satisfied *his* burden of proving the validity of any of the transactions—that is, the trial court did not analyze whether Carlos demonstrated the fairness of his actions in making the gifts to any third party or to himself or whether the transfers were free of undue influence. *See Cartwright v. Batner*, 2d Dist. Montgomery No. 25938, 2014-Ohio-2995, ¶ 4 (holding that the trial court failed to address whether the defendant rebutted the presumption when "[t]here was sufficient evidence of transfers of funds to [the defendant], causing the burden to shift to [the defendant] to show that his conduct was free of undue influence and fraud"). Instead, the trial court assumed that the transactions must have been legitimate because Adelina did not revoke the power of attorney and because the probate court appointed Carlos as Adelina's guardian, which "enabled additional oversight by the probate court to ensure that assets and expenses were appropriately maintained." (*Id.*).

*Self-Dealing*

**{¶35}** The record reflects that Carlos engaged in several self-dealing transactions. *See Bacon*, 2003-Ohio-1301, at ¶ 34 (concluding "that the moving parties met their initial burden" of proving that "the evidence of self-dealing created a presumption that the [transfer] was invalid as a matter of law"). *See also Fox*, 2002-Ohio-2824, at ¶ 54. Importantly, the record reflects that Carlos not only had access to Adelina's bank accounts but that he used them to benefit himself. *Compare Young*, 2017-Ohio-9015, at ¶ 62 (analyzing that "although [the defendant] was [the decedent's] attorney-in-fact and had access to certain of [her] bank and credit card accounts, there was no evidence she used them to benefit herself"). *See also Fox* at ¶ 38 (detailing the defendant's self-dealing by noting that she "wrote several checks from [the decedent's] Credit Union account totaling $11,000" and "made $12,9006 in withdrawals to 'cash' from the [decedent's] Family Trust signing [the decedent's] name as trustee").

**{¶36}** Indeed, Thomas identified (with particularity) in her complaint the following self-dealing transfers made by Carlos in his capacity as attorney in fact for Adelina: (1) a series of cash withdrawals (which Thomas specified as 24 transactions) from Adelina's Fort Jennings State Bank account totaling $135,000.00; (2) a series of eight withdrawals from Adelina's Fort Jennings State Bank account totaling $1,707.32 and resulting in the closure of that account; (3) a

series of check and debit withdrawals (which Thomas specified as 18 transactions) from Adelina's Union Bank account (1796) totaling $16,371.00; and (4) a series of seven withdrawals totaling $6,300.00 from Adelina's Union Bank account (8011).[9]

**{¶37}** Because "[s]elf-dealing by a fiduciary creates a presumption that the action is invalid, * * * an attorney-in-fact is obligated to demonstrate the fairness of his conduct." *Castro v. Castro*, 8th Dist. No. 98710, 2013-Ohio-1347, ¶ 28, citing *Bacon* at ¶ 30. *See also Fox* at ¶ 54 (asserting that "the burden rested with [the defendant] to show that her conduct was free of undue influence and that [the decedent] voluntarily acted with full knowledge of the consequences of his actions by a preponderance of the evidence" since the defendant "was in a fiduciary relationship with [the decedent] as his Power of Attorney" and because "several changes were made to [the decedent's] estate plan which increased the amount of [the decedent's] estate [the defendant] would receive" during the fiduciary relationship). Therefore, we must assess whether there is a genuine issue of material fact that the defendants demonstrated—by a preponderance of the evidence—that the foregoing self-dealing transfers were free from undue influence. *See Fox* at ¶ 54.

**{¶38}** Based on our review of the record, we conclude that genuine issues of material fact remain as to whether the defendants satisfied that burden. *See id.* at ¶

---

[9] Thomas amended her contention to allege that Carlos withdrew (in his capacity as attorney in fact for Adelina) $36,057.50 from Adelina's Union Bank account (1796).

38 (noting that the defendant "failed to produce any credible evidence to rebut the undue influence" and that "[t]he majority of the testimony [the defendant] relies on to prove that [the decedent] was not unduly influenced was her own"). Significantly, instead of fulfilling the obligation of producing evidence supporting their position while demonstrating the absence of evidence that would support Thomas's case, Carlos merely casts aside Thomas's claims of self-dealing with a broad-brush denial. *See Fox* at ¶ 54 (underscoring that the defendant "failed to produce any credible evidence to rebut the undue influence other than the fact that [the decedent's] signature was on the documents"). *See also Cartwright*, 2014-Ohio-2995, at ¶ 80 ("Instead of explaining the amounts that were expended, and offering proof that they were legitimate expenses on [the decedent's] behalf, or at her behest, [the defendant] professed ignorance even of payments made for his own mortgage.").

{¶39} Relevantly, the only evidence put forth by Carlos alluding to the validity of the self-dealing transfers is a self-serving affidavit in which Carlos avers that Adelina "instructed [him] to give gifts to family members from time to time" and that he "never received any funds from [Adelina], or distributed any gifts for [Adelina] without her instructions to do so." (Doc. No. 54, Ex. A). *Accord Brown*, 2016-Ohio-4916, at ¶ 63 (underscoring that "the only evidence of [the defendant's] alleged reason for the transfers were her own self-serving statements"); *Love*, 2021-

Ohio-558, at ¶ 41 (noting that "appellant presented no evidence other than his own testimony" when assessing, in part, whether summary judgment was appropriate). Carlos further asserts that Adelina instructed him to "get money out of her account in order to gift [Thomas] * * * ." (*Id.*).

{¶40} In other words, Carlos's rudimentary denial of Thomas's claims does not satisfy his burden of proving the fairness of his conduct or the validity of the self-dealing transactions identified by Thomas. *See Bacon* at ¶ 45 ("The fact that [the defendant] was expressly authorized by a DPA to make gifts of [the decedent's] property is irrelevant if the act was done for a purpose that constituted a breach of his duty of loyalty."). For instance, applying Carlos's denial to the self-dealing transactions, Carlos failed to identify which of the specific transactions isolated by Thomas that Adelina instructed him to distribute as gifts or which transactions were allegedly gifts to Thomas. *See In re Guardianship of Blumetti*, 1994 WL 45250, at *4 (documenting that, "although each of the alleged beneficiaries testified that [the donor] had intended to give them the monies in question, no one testified as to the specific statements made by [the donor]; and [the beneficiaries] testified that they could not recall if she had ever told them that she wanted to give them the money").

{¶41} Specifically, other than Carlos's self-serving affidavit, there is no other evidence in the record that Adelina intended for the self-dealing transactions to be gifts to anyone. *See Fox* at ¶ 38 (noting that the defendant alleged that she

"used the funds from the accounts and the trust to make repairs to [the decedent's] properties and to pay for legal fees" but "did not provide any documentation to evidence these repairs nor did she produce any document authorizing her to withdraw these funds"). Significantly, Carlos did not assert that Adelina intended for any of the self-dealing transfers to be a gift to *him*. *See Cartwright* at ¶ 73 (detailing the transactions conducted from the decedent's accounts and concluding that the defendant "never presented any evidence indicating that these payments were made on [the defendant's] behalf, rather than his"). Consequently, we conclude that Carlos's abstruse denial does not satisfy his burden of demonstrating an absence of a genuine issue of material fact regarding the validity of those self-dealing transactions—that is, that the transactions were free from undue influence. *See Bacon* at ¶ 42. *See also Castro* at ¶ 28; *Fox* at ¶ 57.

{¶42} Similarly, we conclude that reasonable minds could reach different conclusions as to whether those self-dealing transfers were procured through fraud since Carlos was under a duty to disclose material information prior to conducting those transactions. In addition to the foregoing evidence, Thomas presented evidence suggesting that Carlos misrepresented his authority to conduct the self-dealing transactions.

{¶43} Specifically, as to the series of cash withdrawals (which Thomas specified as 24 transactions) from Adelina's Fort Jennings State Bank account

totaling $135,000.00, Thomas presented evidence that Carlos signed the majority of the withdrawal slips in in his individual capacity and that Carlos wrote Adelina's name (yet signed in his individual capacity) on a small fraction of the withdrawal slips. Importantly, Thomas presented evidence that Carlos signed only one withdrawal slip as "Carlos S. Delgado P.O.A." and that only one withdrawal slip bears Carlos's individual signature but with the designation "Carlos Delgado for Adelina Delgado." (Doc. No. 1, Ex. 2).

{¶44} Furthermore, as to the remaining self-dealing transactions from Adelina's Fort Jennings State Bank account (resulting in the closure of the account) and the transactions from Adelina's Union Bank accounts, Thomas argues that Carlos did not present any evidence to demonstrate the absence of a genuine issue of material fact that the transactions were authorized by Adelina. In particular, Carlos's general denial that he did not receive any "funds from [Adelina], or distribute[] any gifts for [Adelina] without her instruction to do so" does not identify which of those transactions were authorized as gifts or to whom the alleged gift was intended. Indeed, many of the withdrawals from Adelina's Union Bank account (1796) reflect personal checks written for relatively small amounts. However, Carlos did not provide any documentation evidencing the purpose of those personal checks. Likewise, many of the transactions from that account reflect purchases from retail stores—e.g., Wal-Mart, including many transactions on the same day.

**{¶45}** Therefore, based on our de novo review of the record, and after construing the facts in light most favorable to Thomas (as we are required to do), we conclude that genuine issues of material fact remain as to the validity of the transfers that Carlos executed in his capacity as Adelina's attorney in fact for his own benefit. *See Alibrando v. Miner*, 5th Dist. Licking No. 2021 CA 0010, 2021-Ohio-2827, ¶ 21.

*Third-Party Beneficiaries*

**{¶46}** Furthermore, because Carlos was Adelina's attorney-in-fact, a fiduciary relationship existed between Carlos and Adelina, giving rise to a presumption of undue influence by Carlos to effect transfers to third-party beneficiaries. *Accord Young*, 2017-Ohio-9015, at ¶ 55, 61. *See also Fox*, 2002-Ohio-2824, at ¶ 53. "Where a presumption of undue influence arises based on the existence of a confidential or fiduciary relationship between a donor and a beneficiary, 'the burden of going forward with evidence' shifts to the beneficiary accused of exercising undue influence to show that his or her conduct was free from undue influence." *Young* at ¶ 59, quoting *Landin v. Lavrisiuk*, 8th Dist. Cuyahoga No. 84893, 2005-Ohio-4991, ¶ 23, and citing *Ryerson v. White*, 8th Dist. Cuyahoga No. 100547, 2014-Ohio-3233, ¶ 17. *See also Huntington v. Riversource*, 7th Dist. No. Mahoning 14 MA 90, 2015-Ohio-5600, ¶ 41. Again, "[t]he beneficiary may rebut the presumption by demonstrating [by a preponderance of the evidence] that

the donor acted voluntarily, in an exercise of his or her free will, with a full understanding of his or her actions and their consequences." *Young* at ¶ 59, citing *In re Guardianship of Simmons*, 6th Dist. Wood No. WD-02-039, 2003-Ohio-5416, ¶ 26. *See also Ciszewski*, 2013-Ohio-1765, at ¶ 11. Nevertheless, "'the party attacking the transfer retains the ultimate burden of proving undue influence by clear and convincing evidence.'" *Young* at ¶ 59, quoting *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, ¶ 38, 40 (8th Dist.), and citing *In re Estate of Eyrich*, 11th Dist. Trumbull No. 2016-T-0002, 2016-Ohio-7165, ¶ 25 and Evid.R. 301.

{¶47} Here, Thomas alleges that Carlos (in his capacity as Adelina's attorney in fact) directed the following transfers: (1) a series of cashier's check withdrawals (which Thomas specified as 15 transactions) made out to various companies and persons from Adelina's Fort Jennings State Bank account totaling $20,455.05; (2) a series of wire transfers and cashier's check withdrawals (which Thomas specifies as 16 transactions) from Adelina's Fort Jennings State Bank account totaling $138,500.00 to Luna; (3) a series of 13 wire transfers from Adelina's Fort Jennings State Bank account totaling $132,000.00 to Paul; and (4) the transfer of Adelina's real property to Carlos. Based on Thomas's assertions, a presumption of undue influence arose, and Carlos (in his capacity as attorney in fact) is required to rebut that presumption by demonstrating (by a preponderance of the evidence) that the

transfers were free from undue influence. However, based on our review of the record, we conclude that genuine issues of material fact remain as to whether Carlos (in his capacity as attorney in fact) rebutted that presumption of undue influence. Moreover, the record reflects genuine issues of material fact as to whether those transactions were procured through fraud.

{¶48} Chiefly, Carlos's affidavit provides *no* explanation as to the validity of the transactions identified by Thomas concerning the series of cashier's check withdrawals made out to various companies and persons. *See Cartwright*, 2014-Ohio-2995, at ¶ 77-79 (reviewing the decedent's financial statements and proclaiming that they reflected "disturbing trends" because "the pattern of expenditures [was] unusual for a person in [the decedent's] position"). That is, Carlos did not indicate whether Adelina instructed Carlos to effect those transactions, whether they were for Adelina's benefit, or whether Adelina ratified those transactions. *See Bacon*, 2003-Ohio-1301, at ¶ 51. *See also Cartwright* at ¶ 72 (asserting that "[u]nless [the defendant] showed [the decedent] the statements (and there is no indication that he did this), only [the defendant] would have known what amounts were being expended").

{¶49} Similarly, Carlos's affidavit does not indicate who withdrew the funds from Adelina's Fort Jennings State Bank account resulting in the closure of that account or who withdrew the funds from Adelina's Union Bank accounts.

Likewise, there is no evidence in the record indicating whether Adelina instructed Carlos to effect those transactions, whether those transactions were for Adelina's benefit, or whether Adelina ratified them. Moreover, Carlos did not provide *any* other evidence—e.g., an affidavit or deposition testimony from the bank or beneficiary of the cashier's checks—indicating that the transactions were at Adelina's direction, for Adelina's benefit, or ratified by Adelina. *Compare Modie v. Andrews*, 9th Dist. Summit No. 19543, 2000 WL 1026682, *5 (July 26, 2000) (acknowledging that "[t]he bank officer who closed the certificate of deposit and the savings account testified that she spoke with [the decedent] on the phone regarding the accounts and that [the decedent] confirmed that the accounts were to be closed" and that the attorney in fact consulted with the decedent regarding transactions).

{¶50} Moreover, the withdrawal slips connected to the series of cashier's check withdrawals (which Thomas specified as 15 transactions) made out to various companies and persons from Adelina's Fort Jennings State Bank accounts totaling $20,455.05 reflect the same issues that the cash-withdrawal slips reveal. Specifically, some of the withdrawal slips reflect only Carlos's name and individual signature, while some reflect that Carlos marked Adelina's name (yet signed in his individual capacity). As to the cashier's checks, Carlos signed all of the cashier's checks in his individual capacity except for two, which are signed "Adelina

Delgado"; however, a simple caparison of the signatures suggests that Carlos forged Adelina's signature. (Doc. No. 1, Ex. 3).

**{¶51}** As evidence demonstrating an absence of a genuine issue of material fact, Carlos avers only that Adelina authorized him to distribute *gifts*. However, the cashier's check withdrawals made out to companies—including the Overhead Door Company of Findlay, Lowe's, Meyers Hauling, Riley's Carpet, and the Putnam County Treasurer—do not suggest that those withdrawals signified that they were gifts. Importantly, Carlos does not aver that he made any withdrawals (including the cashier's check withdrawals made out to companies) for Adelina's benefit.

**{¶52}** As to the wire transfers and cashier's check withdrawals authorized by Carlos to Paul and Luna, other than Carlos's generalized averment that Adelina "instructed [him] to give gifts to family members from time to time," the defendants did not provide any evidence reflecting that Adelina intended for the funds to be gifts or an advancement on their inheritance. (Doc. No. 54, Ex. A). In other words, Carlos did not detail the fairness of his actions by making those gifts to Paul and Luna. Specifically, Carlos did not specify whether Adelina instructed him to gift large sums of money to Paul or Luna. Conversely, Carlos detailed in his affidavit that Adelina "request[ed] that [he] get money out of her account in order to gift to [Thomas]." (*Id.*). However, there is no evidence of in the record that Thomas received any gifts from Carlos or Adelina. Likewise, neither Paul nor Luna

presented an affidavit bolstering Carlos's contentions that (at least the series of wire transfers or cashier's check withdrawals remitted to Paul and Luna) were gifts from Adelina or that Adelina authorized or ratified the transfers as gifts.

**{¶53}** Furthermore, the wire transfers reflect many of the issues demonstrated by the cash and cashier's check withdrawals. Specifically, Carlos indicated Adelina as the sender on the wire transfers (to Luna as well as Paul) but signed all (except for two) in his individual capacity. On the cashier's checks, Carlos signed in his individual capacity, but marked Adelina's name on some of the withdrawal slips.

**{¶54}** Finally, the transfer of Adelina's real property to Carlos is troublesome. Even though the face of the deed reflects that it was executed by Adelina, our analysis does not end there. "'"'A deed executed in the correct form is presumed to be valid and will not be set aside except upon clear and convincing evidence.'"'" *Estate of Everhart v. Everhart*, 12th Dist. Madison No. CA2013-07-019, 2014-Ohio-2476, ¶ 35, quoting *Fewell v. Gross*, 12th Dist. Butler No. CA2006-04-096, 2007-Ohio-5788, ¶ 27, quoting *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991). However, a presumption of undue influence arises from the existence of a fiduciary relationship, which must be rebutted by the beneficiary to demonstrate the absence of undue influence by a preponderance of the evidence. *See Lawarre v. Fifth Third Secs., Inc.*, 1st Dist. Hamilton No. C-110302, 2012-

Ohio-4016, ¶ 132; *Hardy v. Fell*, 8th Dist. Cuyahoga No. 88063, 2007-Ohio-1287, ¶ 21, 24. If the beneficiary successfully rebuts that presumption, the burden returns to the ""party seeking rescission and cancellation of a deed""" to prove by clear and convincing evidence that it was obtained through undue influence. *Everhart* at ¶ 35, quoting *Fewell* at ¶ 27, quoting *Henkle* at 735.

{¶55} Indeed, as Adelina's attorney-in-fact, a presumption of undue influence by Carlos results. *Accord Sigler v. Burk*, 3d Dist. Crawford No. 3-16-19, 2017-Ohio-5486, ¶ 89. Nevertheless, based on our review of the record, we conclude that reasonable minds could disagree as to whether Carlos rebutted the presumption (by a preponderance of the evidence) that Adelina was unduly influenced to transfer her real property to him. *See Castro*, 2013-Ohio-1347, at ¶ 28.

{¶56} Even though Carlos avers in his affidavit that Jill Welch ("Welch")— the attorney that prepared the durable power of attorney and the deed—"was never previously or at any time now, [his] attorney," Carlos did *not* provide an affidavit or deposition testimony from Welch supporting his assertion. (Doc. No. 54, Ex. A). *See Lake Royale Landowners Assn. v. Dengler*, 11th Dist. Portage No. 2022-P-0021, 2022-Ohio-2929, ¶ 31 (noting that "courts have found that an attorney/notary's testimony holds a 'special credence' when testamentary capacity is in dispute"); *Huntington*, 2015-Ohio-5600, at ¶ 42. Likewise, even though Carlos avers that

Adelina transferred her real property to him based on Welch's advice "to gift said property to one or more of her children and remove her name from the property for long term care planning purposes," the record is devoid of any evidence from Welch sustaining that assertion. (Doc. No. 54, Ex. A). *Compare Estate of Kretzler v. Kretzler*, 5th Dist. Fairfield No. 15-CA-18, 2015-Ohio-4776, ¶ 18 (noting that the moving party presented the deposition of the attorney who prepared the decedent's will to demonstrate the absence of a genuine issue of material fact as to the non-moving party's claim that the will was procured by fraud, duress, or undue influence).

{¶57} Furthermore, the legal documents themselves do not support Carlos's burden of demonstrating the validity of the property transfer—that is, neither the durable power of attorney nor the deed alone make it more probable that the transfer of Adelina's residence was free from undue influence. Significantly, the durable power of attorney and the deed reveal that Welch also notarized each legal document. *Accord Lake Royale Landowners Assn.* at ¶ 31 (noting that an attorney is a necessary witness "because he notarized the limited power of attorney that the principal executed while allegedly mentally incompetent"), citing *In re Guardianship of Carney*, 8th Dist. Cuyahoga No. 110034, 2021-Ohio-1819, ¶ 29-31. In other words, neither legal document bears the signature of an independent, third-party witness verifying the veracity of the documents. *See Firestone*, 895

F.Supp. at 931 (listing the evidence presented by the defendants); *Lake Royale Landowners Assn.* at ¶ 31 (documenting that an "attorney for a personal representative was properly disqualified where the attorney prepared and notarized the will and where the issues before the trial court concerned the testamentary capacity of the decedent and undue influence"), citing *Eccles v. Nelson*, 919 So.2d 658, 660-661 (Fla.App.2006). *See also Landmark Properties, L.L.C. v. Trent*, 4th Dist. Pike No. 16CA862, 2016-Ohio-8574, ¶ 24 ("Interestingly, the affidavit was prepared and notarized by Landmark's attorney."). Thus, we conclude that the defendants failed to satisfy their burden.

*Unaccounted Distributions from Adelina's Guardianship and Estate*

**{¶58}** In her third assignment of error, Thomas alleges that the trial court erred by granting summary judgment in favor of the defendants because genuine issues of material fact remain concerning $184,478.00 in unaccounted for distributions from Adelina's estate. Specifically, Thomas avers that Carlos provided the probate court a "first and final account" of Adelina's guardianship reflecting a balance of $198,771.38. (Doc. No. 1, Ex. 10). However, Thomas avers that the defendants provided the probate court an "inventory and appraisal" of Adelina's probate estate reflecting a balance of $10,293.00. Accordingly, Thomas contends that there are genuine issues of material fact as to whether the defendants perfected any disbursement between the first and final account of Adelina's

guardianship and the "inventory and appraisal" of Adelina's probate estate through undue influence or fraud.

**{¶59}** "'[T]he power to define the jurisdiction of the courts of common pleas rests in the General Assembly and * * * such courts may exercise only such jurisdiction as is expressly granted to them by the legislature.'" *Dumas v. Estate of Dumas*, 68 Ohio St.3d 405, 408 (1994), quoting *Seventh Urban, Inc. v. Univ. Circle Property Dev., Inc.*, 67 Ohio St.2d 19, 22 (1981). Specifically, "'[t]he court of common pleas is a court of general jurisdiction. It embraces all matters at law and in equity that are not denied to it.'" *Id.*, quoting *Saxton v. Seiberling*, 48 Ohio St. 554, 558-559 (1891).

**{¶60}** "The probate court is a court of limited jurisdiction, and therefore it can only exercise jurisdiction when authority is expressly construed by statute." *Lamar v. Washington*, 3d Dist. Allen No. 1-05-54, 2006-Ohio-1414, ¶ 15. *See Campbell, v. Donald A. Campbell 2001 Trust*, 8th Dist. Cuyahoga No. 109585, 2021-Ohio-1731, ¶ 18 ("The probate court is a court of limited jurisdiction; it can exercise such powers as are conferred on it by statute and the constitution of the state."). Generally, the probate court has exclusive jurisdiction over all matters set forth under R.C. 2101.24(A), all matters pertaining to the administration of estates, all matters pertaining to a guardian and his or her ward, and to all matters "touching the guardianship." *In re Guardianship of Pieper*, 12th Dist. Preble No. CA2013-

11-010, 2014-Ohio-5195, ¶ 17, fn.3.   Further, R.C. 2101.24(B) enumerates the probate court's concurrent jurisdiction with the general division of the court.  *See also Sosnoswsky v. Koscianski*, 8th Dist. Cuyahoga  No. 106147, 2018-Ohio-3045, ¶ 26.

**{¶61}** "The jurisdictional-priority rule provides that as between state courts of concurrent jurisdiction, the tribunal whose power is first invoked acquires exclusive jurisdiction to adjudicate the whole issue and settle the rights of the parties."  *State ex rel. Consortium For Economic & Community Dev. for Hough Ward 7 v. Russo*, 151 Ohio St.3d 129, 2017-Ohio-8133, ¶ 8.  The "rule is only applicable when there are two cases *pending* in two different courts of concurrent jurisdiction," and demands "the judge in the second case definitively and unambiguously lacks jurisdiction by operation of this rule."  (Emphasis added.) *Campbell* at ¶ 23.  *But see State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Court of Common Pleas, Probate Div.,* 150 Ohio St.3d 230, 2016-Ohio-7382.

**{¶62}** Regarding guardianships, "the probate court has exclusive jurisdiction to appoint and remove guardians and to direct and control their conduct and settle their accounts."  *In re Guardianship of Derakhshan*, 110 Ohio App.3d 190, 195-196 (11th Dist.1996).  *See also In re Guardianship of Lieber*, 8th Dist. Cuyahoga No. 109646, 2020-Ohio-5625, ¶ 6 ("Probate courts have subject-matter jurisdiction over guardianships and guardianship funds."); R.C. 2101.24(A)(1)(c).  In particular, the

Revised Code directs a guardian "to obey all orders and judgments of the probate court touching the guardianship." R.C. 2111.13(A)(4). *See also* R.C. 2111.50(A)(1) (providing that "[a]t all times, the probate court is the superior guardian of wards who are subject to its jurisdiction, and all guardians who are subject to the jurisdiction of the court shall obey all orders of the court that concern their wards or guardianships").

{¶63} However, "'[i]t is well-settled that the death of a ward terminates any guardianship proceedings by operation of law.'" *In re Guardianship of Lieber* at ¶ 7, quoting *In re Guardianship of Mogul*, 11th Dist. Trumbull No. 2001-T-0083, 2002 WL 819164, *2 (Apr. 30, 2002). Nevertheless, the guardianship proceedings do not completely terminate immediately following the ward's death—that is, "'a guardian has the power after the ward's death to make a proper accounting and settlement of any acts taken in regard to the ward's assets.'" *Id.*, quoting *State ex rel. Estate of Hards v. Klammer*, 110 Ohio St.3d 104, 2006-Ohio-3670, ¶ 12. *See also Simpson v. Holmes*, 106 Ohio St. 437, 439 (1922) ("The guardian is the personal representative of the ward while the ward lives; upon the ward's death the administrator or executor becomes his personal representative.").

{¶64} Moreover, "any matter 'related to the administration of an estate and the distribution of its assets [is] within the exclusive jurisdiction of the probate court.'" *Grimes v. Grimes*, 173 Ohio App.3d 537, 2007-Ohio-5653, ¶ 16 (4th Dist.),

quoting *Mock v. Bowen*, 6th Dist. Lucas No. L-91-210, 1992 WL 163959, *3 (July 17, 1992), citing R.C. 2101.24(A)(1)(c). Specifically, the Revised Code vests the probate court "'with jurisdiction over declaratory judgment actions upon questions relating to the administration of an estate.'" *Id.* at ¶ 17, quoting *State ex rel. Lipinski v. Cuyahoga Cty. Court of Common Pleas, Prob. Div.*, 74 Ohio St.3d 19, 22 (1995). *See also* R.C. 2101.24(A)(1)(l) and 2721.05. Likewise, "the probate court is vested with exclusive jurisdiction involving will-contest actions." *Powell v. Williams*, 8th Dist. Cuyahoga No. 110536, 2022-Ohio-526, ¶ 15. *See also* R.C. 2101.24(A)(1)(p).

**{¶65}** However, based on the specific facts and circumstances of this case, we conclude that the general division of the court had jurisdiction to hear and determine Thomas's intentional-interference-with-expectancy-of-an-inheritance claim as it relates to the $184,478.00 in unaccounted distributions from Adelina's estate.[10] *Accord Phillips v. Phillips*, 5th Dist. Richland No. 12CA119, 2013-Ohio-3025, ¶ 22. *See Love*, 2021-Ohio-558, at ¶ 32 (asserting "that the probate court does not have plenary jurisdiction over the claim for intentional interference with expectancy of inheritance"); *Roll*, 156 Ohio App.3d 227, 2004-Ohio-767, at ¶ 29. ("The complexity of this case arises due to the fact that, while the will contest and

---

[10] "It has been observed that Ohio's complex jurisdictional rules for probate courts create continuing problems in construing the relationship between Ohio's general and probate divisions and that courts have been unable to develop any useful test to determine when a dispute regarding the administration of an estate would confer exclusive jurisdiction over an action on the probate court." *Estate of Dombroski v. Dombroski*, 7th Dist. Harrison No. 14 HA 3, 2014-Ohio-5827, ¶ 16. *See also Love v. Love*, 4th Dist. Jackson No. 20CA4, 2021-Ohio-558, ¶ 34, fn. 2.

the claim of intentional interference with expectancy of inheritance are closely related and may provide different forms of relief for the same or similar legal wrongs, no single court has jurisdiction to hear both claims."). *See also Gibson v. Shepard*, 8th Dist. Cuyahoga No. 109311, 2020-Ohio-4569, ¶ 11-12.

**{¶66}** Indeed, the record unequivocally reflects that a settlement of the estate accounts and an order of distribution by the probate court occurred. *See Goff v. Ameritrust Co.*, 8th Dist. Cuyahoga No. 65196, 1994 WL 173544, *5 (May 4, 1994), quoting *Neidecker v. Neidecker*, 63 Ohio App. 416 (6th Dist.1939), syllabus. Likewise, this case does not involve an unresolved will contest, an undue-influence claim in probate court, or any issue as to judicial expediency. *Accord Phillips* at ¶ 22 (analyzing that the claims were within the jurisdiction of the general division of the court because the case did "not include an unresolved will contest, an undue influence claim in probate court, or any issue as to judicial expediency").

**{¶67}** "The relationship between a guardian and a ward is fiduciary in nature, and in discharging the duties of a guardian, the law requires fiduciaries 'to act in good faith and primarily for the benefit of the ward in matters connected with his well-being." *In re Guardianship of Guzay*, 10th Dist. Franklin No. 02AP-745, 2003-Ohio-5036, ¶ 22, quoting *In re Briggs*, 9th Dist. Summit No. 18117, 1997 WL 416331, *2 (July 9, 1997). Likewise, "An executor, administrator, or other personal representative of a testamentary estate is a fiduciary * * * ." *In re Estate of Usiak*,

172 Ohio App.3d 262, 2007-Ohio-3038, ¶ 35 (7th Dist.). "A fiduciary is statutorily-defined [as] 'any person * * * appointed by and accountable to the probate court and acting in a fiduciary capacity for any person, or charged with duties in relation to any property, interest, trust, or estate for the benefit of another * * * .'" *Estate of Dombroski v. Dombroski*, 7th Dist. Harrison No. 14HA3, 2014-Ohio-5827, ¶ 40, quoting R.C. 2109.01.

{¶68} Because the defendants—namely, Carlos (as guardian) and Paul (as executor)—were in a fiduciary capacity with respect to Adelina's guardianship and estate, respectively, a presumption arises that they unduly influenced the depletion of the guardianship account and estate account, respectively. *See Foelsch* 2020-Ohio-1259, at ¶ 17. *See also Fox*, 2002-Ohio-2824, at ¶ 52 ("Undue influence actions regarding * * * payable on death accounts * * * have also applied a presumption of undue influence when there is a fiduciary relationship between the creator of the account and the beneficiary"). Consequently, to rebut the presumption of undue influence that arises in this instance, the defendants must present "evidence that the decedent acted voluntarily and free from undue influence." *Fikes v. Estate of Fikes*, 1st Dist. Hamilton No. C-210515, 2022-Ohio-2075, ¶ 12. Again, "[t]he ultimate question is 'whether undue influence manifested a result different than would have been reached absent the undue influence.'" *Id.* at ¶ 11, quoting *Redman v. Watch Tower Bible & Tract Soc.*, 69 Ohio St.3d 98, 102 (1994).

**{¶69}** Generally, the Revised Code requires a guardian "to 'manage the estate for the best interest of the ward.'" *In re Guardianship of Guzay* at ¶ 22, quoting R.C. 2111.14(B). *See also Friedrich v. BancOhio Nat. Bank*, 14 Ohio App.3d 247, 251 (12th Dist.1984) ("The guardian has a duty to manage and conserve the assets and property belonging to her ward in order to provide for the ward's care and maintenance."). "'Traditionally, a guardian is limited to taking custody of a ward's property, protecting it and, with the court's approval, making a certain disposition of it.'" *Friedrich* at 251, quoting *Toledo Trust Co. v. Natl. Bank of Detroit*, 50 Ohio App.2d 147, 159 (6th Dist.1976). Furthermore, the Revised Code "requires a guardian to 'make and file within three months after his appointment a full inventory of the real and personal property of the ward [and] its value * * * .'"[11] *Id.*, quoting R.C. 2111.14(A). *See also* R.C. 2111.141.

**{¶70}** As evidence that the transfer here was free from undue influence, Carlos avers that "[t]he disparity in what was in the guardianship account at the time of Adelina['s] death of $198,771 to what was transferred into the Estate of Adelina Delgado comes from an account registration error by the Union Bank Company." (Doc. No. 54, Ex. A). Specifically, Carlos avers that the bank "kept Adelina['s] same account, and just listed [Carlos] as guardian" "[i]nstead of setting up a new guardianship account * * * ." (*Id.*). As a result, Carlos avers that, because "that

---

[11] There is no evidence in this record that Carlos filed a full inventory of Adelina's real and personal property within three months after his appointment.

account had a payable on death," "[i]t paid out in equal shares to [Carlos] and all [his] siblings, including [Thomas]." (*Id.*).

**{¶71}** "'Although a [payable-on-death] account is contractual in nature, it has a special purpose.  It allows a person to make a testamentary disposition of assets without following the formalities of the Statute of Wills, R.C. Chapter 2107.'" *Hillier v. Fifth Third Bank*, 2d Dist. Miami No. 2019-CA-21, 2020-Ohio-3679, ¶ 28, quoting *Witt v. Ward*, 60 Ohio App.3d 21, 26 (12th Dist.1989).  *See also Estate of Eyrich*, 2016-Ohio-7165, at ¶ 23 (stating that "[a] payable on death account is * * * created by a written contract"); R.C. 2131.10.  "'The depositor of a payable-on-death * * * account retains her rights to ownership and full control of such account during her lifetime.'" *In re Estate of Boone*, 190 Ohio App.3d 799, 2010-Ohio-6269, ¶ 61 (7th Dist.), quoting *Miller v. Peoples Fed. S. & L. Assn.*, 68 Ohio St.3d 175 (1981), paragraph one of the syllabus.  "Following a finding of incompetency by the Probate Court, the depositor's ownership rights pass to the legally appointed guardian of her estate, including the right to designate a change in the registration of such account.'" *Id.*, quoting *Miller* at paragraph one of the syllabus.  "Indeed, the guardian of a person and an estate has a duty to provide for maintenance for the ward, as paid out of the ward's estate, which includes health care, debts and other affairs relating to the management of the estate." *Ferguson v. Walsh*, 10th Dist. Franklin No. 02AP-1231, 2003-Ohio-4504, ¶ 18.

**{¶72}** Importantly, Carlos presented no evidence substantiating his contentions. *Accord Fox*, 2002-Ohio-2824, at ¶ 55-56 (concluding that the defendant "failed to produce any credible evidence to rebut the undue influence" and that the majority of the evidence that she relied on was her own testimony). That is, Carlos did not provide any documentation from Union Bank reflecting an account-designation change or—most significantly—any documentation reflecting the payable-on-death designation or its subsequent distribution to the defendants or Thomas. *See Steinhauser v. Repko*, 30 Ohio St.2d 262, 269 (1972). Indeed, the evidence of the "first and final accounting" of Adelina's guardianship does *not* reflect that the Union Bank account had a payable-on-death designation. *See Miller* at 176 (noting that the guardianship inventory reflected the "certificates as payable on death to plaintiffs" and that an amended inventory was filed "listing the change in payees"); *In re Hards*, 175 Ohio App.3d 168, 2008-Ohio-630, ¶ 10 (11th Dist.) (noting that the summary of inventory and accounts "failed to account for guardianship assets" or establish which assets were joint assets or had a beneficiary prior to the establishment of the guardianship). Moreover, there is no evidence in the record reflecting that Thomas received such payable-on-death distribution. Instead, Thomas alleges that "$188,478 [was] money embezzled, converted, taken, and stolen by" Carlos. (Doc. No. 1).

**{¶73}** Therefore, we conclude that genuine issues of material fact remain as to whether the defendants rebutted the presumption of undue influence. *See In re Guardianship of Blumetti*, 1994 WL 45250, at \*4 (concluding "that the determination of whether this evidence is sufficient to rebut the presumption of undue influence should be made in the first instance by the trial court").

**{¶74}** Similarly, "[t]he fiduciary duties of an executor are primarily to collect the estate assets, pay debts, and make distributions." *In re Estate of Usiak*, 2007-Ohio-3038, at ¶ 35. "The executor also owes various duties to the beneficiaries of the estate, duties involving keeping proper accounts, giving timely notice, preserving assets, and avoiding the commingling of property, as well as basic duties of trust and loyalty." *Id.* Consequently, as executor of Adelina's estate, Paul had "a duty to preserve estate assets, and was required to keep proper accounting records." *In re Estate of Barry*, 11th Dist. Geauga No. 2013-G-3147, 2015-Ohio-1203, ¶ 19. The defendants—namely, Paul—did not provide *any* documentation in support of the motion for summary judgment documenting the nature of Adelina's estate assets.

**{¶75}** Therefore, we conclude that reasonable minds could disagree with respect to whether the abovementioned transfers were free from undue influence or fraud. Consequently, we conclude that the defendants failed to satisfy their burden of demonstrating an absence of a genuine issue of material fact regarding the

validity of the transfers to third-party beneficiaries. *See Castro*, 2013-Ohio-1347, at ¶ 28. As a result, based on our de novo review of the record, and after construing the facts in a light most favorable to Thomas, there are genuine issues of material fact remaining as to whether Carlos unduly influenced the transfers to third-party beneficiaries (including himself) or whether Carlos produced those transfers through fraud. *See Gibson v. Shepard*, 8th Dist. Cuyahoga No. 109311, 2020-Ohio-4569, ¶ 13 ("In accordance with the foregoing, and without offering any speculation as to whether Gibson's claims are meritorious, we find that there are genuine issues of material fact and that it has not been established that defendants are entitled to judgment as a matter of law.").

**{¶76}** Thus, while the ultimate burden of proving by clear and convincing evidence that Adelina was unduly influenced remains with Thomas, we conclude (based on the evidence before us) that the trial court erred by not affording Thomas the opportunity to litigate the presumption of undue influence. *Accord Young*, 2017-Ohio-9015, at ¶ 64; *Sigler*, 2017-Ohio-5486, at ¶ 90. *See In re Guardianship of Blumetti*, 1994 WL 45250, at *4 (concluding "that the determination of whether this evidence is sufficient to rebut the presumption of undue influence should be made in the first instance by the trial court" and if the trial court determines that a preponderance of the evidence "presented overcomes the presumption of undue influence, it must" then assess whether the plaintiff "presented clear and convincing

evidence to rebut the * * * presumption"). In addition, we conclude that summary judgment as to Thomas's intentional-interference-with-an-expectancy-of-inheritance claim was improper for the reason that genuine issues of material fact remain whether the defendants procured those transactions through fraud.

*Undue Influence*

**{¶77}** Analogously, Thomas argues under her first assignment of error that "the procurement of the Power of Attorney by [Carlos] was the result of Undue Influence." (Appellant's Brief at 11). As we previously stated, to establish undue influence—when no presumption arises out of a fiduciary or confidential relationship—a party attacking the transfer must demonstrate, by clear and convincing evidence, that "(1) the testator was susceptible to undue influence, (2) another person had an opportunity to exert influence over the susceptible testator, (3) improper influence was exerted or attempted and (4) a result showing the effect of such influence." *Young* at ¶ 52.

**{¶78}** However, based on our review of Thomas's complaint, Thomas did not properly raise this issue in the trial court. Specifically, "'Ohio is a notice-pleading state.'" *Hall v. Crawford Cty. Job & Family Servs.*, 3d Dist. Crawford No. 3-21-19, 2022-Ohio-1358, ¶ 16, quoting *Pugh v. Sloan*, 11th Dist. Ashtabula No. 2019-A-0031, 2019-Ohio-3615, ¶ 26. "Under Civ.R. 8(A), '[a] pleading that sets forth a claim for relief * * * shall contain (1) a short and plain statement of the claim

showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled.'" *Id.*, quoting Civ.R. 8(A). "'Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.'" *Id.*, quoting Civ.R. 8(E)(1). "In sum, '[t]he statement of the claim must give the defendant fair notice of the plaintiff's claim and the grounds upon which it is based.'" *Id.*, quoting *Pugh* at ¶ 27. *See also Montgomery v. Ohio State Univ.*, 10th Dist. Franklin No. 11AP-1024, 2012-Ohio-5489, ¶ 20 (stating that "to constitute fair notice, the complaint must allege sufficient underlying facts that relate to and support the alleged claim; the complaint may not simply state legal conclusions").

{¶79} "Though a plaintiff need not advance a specific legal theory to obtain recovery, 'the complaint must contain either direct allegations on every material point necessary to sustain a recovery or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial.'" *Karras v. Karras*, 2d Dist. Montgomery No. 27606, 2018-Ohio-515, ¶ 17, quoting *Strahler v. Vessels*, 4th Dist. Washington No. 11 CA 24, 2012-Ohio-4170, ¶ 10. "Pleadings in general should be construed 'liberally' for purposes of Civ.R. 8." *Id.*, citing *Crosby v. Beam*, 47 Ohio St.3d 105, 110 (1989).

{¶80} Liberally construing Thomas's complaint, we conclude that Thomas failed to provide the fair notice necessary to pursue an *independent* claim of undue

influence. *See Montgomery* at ¶ 22. Importantly, other than as an element of her intentional-interference-with-expectancy-of-an-inheritance claim, Thomas's complaint lacks any indication that she is raising a claim of undue influence. *See id.* Certainly, there is no inference which may be fairly drawn from Thomas's complaint that she is alleging that the durable power of attorney was "procured" by undue influence as she now alleges under her first assignment of error for the first time on appeal. "It is a long-standing rule of appellate procedure that no new issues can be raised in the appellate court that were not raised before the trial court." *Mason v. Meyers*, 140 Ohio App.3d 474, 477 (3d Dist.2000). Therefore, we conclude that Thomas waived her argument and refuse to address it for the first time on appeal. *Id.*

*Fraud*

**{¶81}** Thomas further contends that summary judgment in favor of the defendants as to her independent-fraud claim was improper because genuine issues of material fact remain as to whether fraud occurred.

**{¶82}** Again, to satisfy a claim for fraud, a plaintiff must prove that there was

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."

*Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 47, quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55 (1987). Importantly, because "[fraud must be pleaded with particularity," "'the pleading must contain allegations of fact which tend to show each and every element of a cause of action for fraud." *Parmatown S. Assn. v. Atlantis Realty Co.*, 8th Dist. Cuyahoga No. 106503, 2018-Ohio-2520, ¶ 7, quoting *Minaya v. NVR, Inc.*, 8th Dist. Cuyahoga No. 105445, 2017-Ohio-9019, ¶ 11. *See also* Civ.R. 9(B).

**{¶83}** Assuming without deciding that Thomas's complaint complied with the requirement for her fraud claim to be pleaded with particularity, we must first address the jurisdiction of the general division of the court of common pleas to consider Thomas's claim. Again, the courts may only exercise jurisdiction that is expressly granted to them by the legislature. *Dumas*, 68 Ohio St.3d at 408. As relevant here, the Revised Code confers to "the probate court exclusive jurisdiction over declaratory actions brought 'to determine any question arising out of the administration of the estate.'" *Lamar*, 2006-Ohio-1414, at ¶ 15, quoting R.C. 2721.05(C). However, "'the probate division has no jurisdiction over claims for money damages arising from allegations of fraud.'" *Dumas* at 408, quoting *Schucker v. Metcalf*, 22 Ohio St.3d 33, 35 (1986).

**{¶84}** In this case, Thomas alleges a cause of action for "fraud perpetrated on Adelina." (Doc. No. 1). In other words, Thomas's fraud claim does not contest

the validity of Adelina's will or challenge the inventory of her probate estate. *Accord Dumas* at 408. Rather, Thomas alleges that Carlos fraudulently transferred the funds and fraudulently induced Adelina to transfer the deed to him so as to render the transfers invalid. *See id.* (casting the fraud claim as alleging "that [the decedent] fraudulently transferred assets to an inter vivos trust and did so with the intent to deprive [the plaintiff] of her rights under Ohio law"). Thus, to the extent that Thomas is seeking a declaration by the trial court setting aside the fraudulent transfers and returning those assets to Adelina's estate, that argument should have been raised in the probate court. *See Lipinski*, 74 Ohio St.3d at 22; *Lamar* at ¶ 15-16. *See also Treadway v. Free Pentecostal Pater Ave. Church of God, Inc.*, 12th Dist. Butler No. CA2007-05-139, 2008-Ohio-1663, ¶ 29; *Estate of Dombroski*, 2014-Ohio-5827, at ¶ 33, fn.3. However, since Thomas's "primary aim is still the recovery of monetary damages for the alleged fraud," Thomas's fraud claim is "within the jurisdiction of the general division of the court of common pleas." *Dumas* at 408. *See also Lamar* at ¶ 17.

{¶85} Nevertheless, "[u]nder Ohio law, a claim in fraud cannot be predicated upon statements or representations made to a third party; i.e., the communication must have been directly with the person who has brought the action." *McWreath* 2012-Ohio-3013, at ¶ 63, citing *Edwards v. Owen*, 15 Ohio 500 (1846). Indeed, "[i]n any litigation, the plaintiff must have standing because '[t]he requirement of

standing ensures that the party challenging an order has a "personal stake in the outcome of the controversy."'" *Camp St. Mary's Assn. of W. Ohio Conference of the United Methodist Church, Inc. v. Otterbein Homes*, 176 Ohio App.3d 54, 2008-Ohio-1490, ¶ 13 (3d Dist.), quoting *Ahrns v. SBA Communications Corp.*, 3d Dist. Auglaize No. 2-01-13, 2001 WL 1167240, *2 (Sept. 28, 2001), quoting *Middletown v. Ferguson*, 25 Ohio St.3d 71, 75 (1986). "A party will have standing where the party can demonstrate an injury in fact." *In re Estate of York*, 133 Ohio App.3d 234, 241 (12th Dist.1999). "An injury in fact requires a showing that the party has suffered or will suffer a specific injury, that the injury is traceable to the challenged action, and that it is likely that the injury will be redressed by a favorable decision." *Id.*

{¶86} Significantly, the basis of Thomas's fraud claim is predicated on an injury suffered by Adelina. *See Treadway* at ¶ 30 ("Furthermore, appellants lack standing to assert these claims. Each of the claims alleged by appellants asserts an injury suffered by the decedent."). *See also Sirak v. Arenstein*, 5th Dist. Stark No. 2011-CA-00053, 2011-Ohio-5266, ¶ 37 (concluding that "the claims for deception or fraud in the inducement are [the mother's] claims because she is the owner of the property."). "Under law, those claims belong to the estate of [the decedent] and may not be asserted by third parties." *Treadway* at ¶ 30. Specifically, "any alleged statement *not* made directly to [Thomas] cannot form the basis of a viable fraud

claim." (Emphasis added.) *McWreath* at ¶ 63. *See also Johnson v. Johnson*, 4th Dist. Vinton No. 98CA519, 1999 WL 527753, *2 (June 25, 1999) (surmising that the plaintiff "would probably not have standing to raise a claim for a fraud perpetrated on another person"). Consequently, the defendants are entitled to judgment as a matter of law as to Thomas's fraud claim. Thus, summary judgment in favor of the defendants as to Thomas's independent-fraud claim is proper.

**{¶87}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued in the first assignment of error, and second assignment of error, in part, we affirm the judgment of the trial court. Having found error prejudicial to the appellant herein in the particulars assigned and argued in the second assignment of error, in part, and third assignment of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**MILLER and WILLAMOWSKI, J.J., concur.**

**/jlr**